PER CURIAM.
James Delano Winkles appeals an order of the circuit court denying his motion to vacate his convictions of first-degree murder and sentences of death filed under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the postconviction court’s order.
I. BACKGROUND
While serving a life sentence for another crime, Winkles confessed to killing Elizabeth Graham and Margo Delimon. In Winkles’ direct appeal we explained the factual circumstances of the murders and confessions as follows:
This case originates from two abductions that occurred more than twenty years ago. First, on September 9, 1980, having identified an employee of a dog grooming business as his victim, appellant arranged as a ruse for a groomer to come to a vacant house. When a different groomer arrived, the 19-year-old Elizabeth Graham, appellant [nevertheless proceeded with] his plan. Abducting her at gunpoint, Winkles handcuffed, gagged, and blindfolded her, and put her in his vehicle. He drove Graham to his grandmother’s house, where he instilled fear in her by handcuffing her hands and feet and firing several .25 caliber rounds into the floor. He raped Elizabeth multiple times over several days. Finally, after he realized that she knew her location (from his grandmother’s magazines), he decided he had to kill her. He drugged her, and when she fell asleep, opened an umbrella over her head to catch the spatter and shot her three times in the head. Winkles burned her clothes and buried her somewhere in Pinellas County. He returned two weeks later, however, fearing someone would discover and identify the body. He removed her head and took it to the Steinhatchee River (in Lafayette County), where he removed the teeth and the lower mandible. Winkles ran water through the skull to be sure no spent bullets remained inside and threw the skull into the river. The skull was discovered in July 1981, and subsequent DNA testing revealed the skull to be *22 Elizabeth Graham’s. For many years, Elizabeth’s murder remained unsolved.
About a year later, in October 1981, appellant chose Margo Delimon for abduction when he visited a model home where Delimon was the realtor.... Margo agreed to see some property with appellant. He instead abducted her, handcuffing her and taking her to a vacant house next door to his grandmother’s. As in the earlier case, he raped the victim repeatedly over the next several days. On the morning of the fourth day, he realized he had to kill her because she could identify him and the house. He killed her with an overdose of sleeping pills, burned her clothes, and buried her in Pinellas County. About two weeks later, he moved the body to Citrus County. A week after that he dug up her head, removed the teeth, and deposited the skull in Hernando County near an area where his family camped.
The murders of Graham and Delimon remained unsolved until 1998 when appellant, a suspect in the cases then serving a prison sentence, contacted authorities claiming to have information. Stating that he was having nightmares about the murders, over the ensuing months he confessed in detail to kidnapping and murdering the two women. He also provided specific information about the women’s personal lives and the location and condition of the victims’ remains. He took detectives to the exact location where Delimon’s body had been found (Delimon’s skull previously had been found exactly where appellant said he disposed of it). Winkles also gave several detailed, videotaped interviews about the murders to a local news channel. Finally, on March 25, 1999, appellant was indicted for the premeditated murders of both women.
Winkles v. State, 894 So.2d 842, 843-44 (Fla.2005) (footnote omitted).
Winkles pleaded guilty to two counts of first-degree murder and waived his right to a jury for the penalty phase. After the State and the defense presented penalty-phase evidence, the circuit court concluded that the aggravating circumstances far outweighed the mitigating circumstances and sentenced Winkles to death on both counts. For each murder, the sentencing court found four aggravating circumstances, each assigned great weight. The sentencing court also found several non-statutory mitigating circumstances but no statutory mitigation.
On direct appeal, Winkles argued that Florida’s death penalty statute was unconstitutional under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court rejected Winkles’ challenges because the prior violent felony aggravating factor was present in his case. Winkles, 894 So.2d at 846-47. Based on its review of the record, this Court further held that the sentencing court properly accepted Winkles’ knowing and voluntary plea and that his death sentences were proportionate under Florida law. Id. at 847-48. Thus, we affirmed the convictions and sentences.
In September 2006, Winkles filed a motion for postconviction relief, which he later amended. The motion raised four claims. The postconviction court conducted an evidentiary hearing and, after considering the evidence presented, denied the motion. In this appeal, Winkles challenges the postconviction court’s denial of his two claims of ineffective assistance of counsel. Winkles does not appeal the denial of his postconviction claims that execution by lethal injection constitutes cruel and unusual punishment and that he may be incompetent at the time of his execution.
*23 II. ANALYSIS
Winkles argues that the postconviction court should have determined that trial counsel provided ineffective assistance by (A) advising Winkles to plead guilty and to waive a penalty-phase jury in the hope that if he were sentenced to death, the sentences would be reversed pursuant to Ring; and (B) failing to present a mental health expert and Winkles’ uncle, James C. Winkles (J.C.), as penalty-phase witnesses.
In order to prevail on a claim of ineffective assistance of counsel, a defendant must show both that trial counsel’s performance was deficient and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As to the first prong, the defendant must establish that “counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment.” Id. at 687, 104 S.Ct. 2052; see also Cherry v. State, 659 So.2d 1069, 1072 (Fla.1995). For the second prong, the reviewing court must determine whether there is a reasonable probability that but for trial counsel’s deficiency, the result of the proceeding would have been different. “A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052. This Court employs a mixed standard of review, deferring to the postconviction court’s factual findings that are supported by competent, substantial evidence, but reviewing legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004).
A. Guilty Plea and Waiver of Penalty-Phase Jury
Winkles argues that the postconviction court erred in denying his claim that trial counsel provided ineffective assistance during the guilt and penalty phases when he advised Winkles to plead guilty and to waive a penalty-phase jury in the hope that if he were sentenced to death, the sentences would be reversed pursuant to Ring.
 Winkles’ guilt-phase argument is insufficiently pleaded and without merit. A defendant challenging trial counsel’s actions regarding a plea “establishes Strickland’s prejudice prong by demonstrating a reasonable probability that, but for counsel’s errors, the defendant would not have pleaded guilty and would have insisted on going to trial.” Grosvenor v. State, 874 So.2d 1176, 1181 (Fla.2004). Winkles did not assert in his postconviction motion that he would not have pleaded guilty but for counsel’s advice about Ring. Similarly, Winkles did not testify during the evidentiary hearing that he would not have pleaded guilty but for counsel’s advice. Thus, he did not establish prejudice with regard to the guilt phase.
Winkles’ argument that trial counsel was ineffective for advising Winkles to waive a penalty-phase jury based on the anticipated effect of Ring is likewise without merit. “A defendant may waive the advisory jury in the penalty phase of a capital case, provided the waiver is voluntary and intelligent.” Grim v. State, 971 So.2d 85, 101 (Fla.2007). Winkles did not establish that he was induced to waive his penalty-phase jury by trial counsel’s advice about Ring. Rather, competent, substantial evidence supports the postconviction court’s finding that the defense made a reasonable strategic decision to waive a penalty-phase jury based on the belief that the sentencing judge would be more receptive to the available mitigation than a jury would be.
*24 During the evidentiary hearing, attorney Bjorn Brunvand, who was Winkles’ counsel at trial, testified that at the time of trial, he believed that the strongest mitigation the defense could offer was that Winkles cooperated with law enforcement officers and helped solve two cold cases. Brun-vand agreed with the State attorney’s assertion during cross-examination that cooperation with law enforcement was “a lawyer issue, a legal issue, a judge thing, where a jury may not give it that much weight.” Attorney Brunvand also agreed that it was fair to say that a jury hearing the disturbing facts of this case “might take that a little more to heart than a judge who’s been involved in the criminal justice system for years, [and who] has pretty much seen it all and heard it all.” Brunvand testified that he discussed this issue with Winkles and that Winkles made the final decision to waive the penalty-phase jury.
Winkles testified at the evidentiary hearing that the process in which a jury would hear the penalty phase and make a recommendation to the judge was explained to him. Winkles also testified that his attorneys told him that the sentencing judge twice had said that Winkles’ assistance in solving the cold cases “ought to be worth something.” When the State asked Winkles if the potential mitigating factor of his cooperation was “a legal thing that a judge would probably take more into account and give more weight than a jury, especially a woman who sits here and hears you say that all women are whores,” Winkles answered “most probably.”
Given the egregious facts of these murders and the sentencing judge’s comments indicating that he would find Winkles’ assistance in resolving the cold cases to be mitigating, trial counsel’s decision to present potentially mitigating evidence to the sentencing judge alone was within the norms of professional conduct.
We also conclude that Winkles has failed to demonstrate prejudice on this point regarding the penalty phase. Winkles argues that he was prejudiced by counsel’s advice because his waiver may have precluded consideration of his Ring claims on appeal. The record refutes this argument. On direct appeal, this Court explained that trial attorney Brunvand filed a motion raising claims pursuant to the anticipated ruling in Ring and concluded that defense counsel preserved the issues for appeal. Winkles, 894 So.2d at 844. This Court considered Winkles’ Ring claims on the merits without finding a waiver or procedural bar. Our decision turned on the presence of the prior violent felony conviction aggravating factor, not whether Winkles was sentenced with a recommendation from a jury. Id. at 845-47. Any misadvice by trial counsel did not affect Winkles’ appellate claims.
Finally, to the extent that Winkles argues more generally that he was prejudiced by trial counsel’s advice because he was denied the opportunity to present potentially mitigating evidence to a jury, his argument is insufficiently pleaded. Winkles did not explain in his postconviction motion or on appeal how conducting the penalty phase before a jury would have affected his sentences.
B. Penalty-Phase Witnesses
1. Mental Health Expert
Winkles argues that the postconviction court erred in denying his claim that reasonable trial counsel would have had Winkles evaluated by a mental health expert and would have presented the expert during the penalty phase. Winkles asserts that a mental health expert could have testified about Winkles’ mental health *25 and alleged history of sexual abuse. The postconviction court denied this claim, determining that trial counsel made a reasonable strategic decision not to call a mental health expert during the penalty phase after consulting with several experts. We conclude that the postconviction court did not err in denying this claim.
This Court has held that “strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.” Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000). In this case, competent, substantial evidence supports the conclusion that defense counsel consulted three mental health experts and made a strategic decision not to call an expert to testify. This strategic decision was reasonable, and accordingly, Winkles has not demonstrated deficiency.
Attorney Brunvand’s testimony established that the defense consulted three experts about Winkles’ mental health. Brunvand testified that before he took over as penalty-phase counsel, prior counsel had Dr. Jerry Brittain evaluate Winkles and prepare reports. Attorney Brun-vand stated that he reviewed the reports and spoke with Dr. Brittain. Brunvand stated that he personally retained Dr. Sidney Merin, who reviewed Dr. Brittain’s findings, and that Dr. McCay Vernon, a retired psychologist, evaluated Winkles on a pro bono basis. Brunvand explained that while the defense did not retain Dr. Vernon for the purpose of testifying at trial, Brunvand consulted with Dr. Vernon to hear his professional opinion about Winkles’ mental health.
Attorney Brunvand further testified that based on his consultations with these experts, he advised Winkles against presenting evidence about Winkles’ mental health during the penalty phase. When asked about Dr. Brittain, Brunvand explained that “what the psychologist had to say really wasn’t helpful, and it was really inconsistent with our plea that, you know, Mr. Winkles had solved ... two crimes that would never have been solved but for him coming forward.” When the State asked Brunvand if he felt that “the medical testimony could prove to be more damaging than beneficial,” he agreed. Attorney Brunvand testified that in “general terms,” Dr. Merin agreed that mental health testimony would not be beneficial to Winkles.
Attorney Brunvand also testified that he made a strategic decision not to introduce evidence that Winkles was allegedly sexually abused by his grandmother and his aunts. Brunvand stated that at the time of trial, he knew Winkles alleged that his grandmother and his aunts sexually abused him. Brunvand then explained that he believed that he would have had to call Winkles or present excerpts of taped interviews where Winkles talked about the abuse to present the sexual abuse as potential mitigation. Brunvand further explained that he did not want to present Winkles’ live or taped statements about the sexual abuse because “it just didn’t come across well.” Brunvand testified that Winkles spoke of the sexual abuse “as if he was proud” and as if “it was a good thing and not a bad thing, even in retrospect.” Attorney Brunvand agreed with the State’s characterization that there was some “[pjretty shocking stuff’ on the taped interviews with television reporter Marcia Crawley. Brunvand also agreed with the statement that “the State wouldn’t have been able to play those things because they would have been prejudicial and irrelevant, unless you were intending to go into those.” Finally, while attorney Brunvand did not testify directly about the possibility of a mental health expert presenting Winkles’ history of sexu *26 al abuse, when asked if it would have been prudent for the defense to offer evidence of “how [Winkles] got the way he was,” Brunvand answered that “to say that ... he was sexually abused and that’s consistent with him being a serial killer, I don’t know that that really would help me in persuading the Court that he should not get the death penalty.”
This Court previously has found no deficiency where trial counsel made a strategic decision not to present expert witness testimony after investigating and concluding that the testimony would be more harmful than helpful. See, e.g., Bowles v. State, 979 So.2d 182, 188 (Fla. 2008) (holding that counsel made reasonable strategic decision not to call mental health expert as witness where expert would have testified that defendant was only mildly impaired, impulsive, and dangerous); Pace v. State, 854 So.2d 167,173-74 (Fla.2003) (holding that counsel made reasonable strategic decision not to present evidence of drug use where counsel consulted expert witnesses and witnesses gave unfavorable reports). This Court has also determined that “[t]rial counsel is not deficient where he makes a reasonable strategic decision to not present mental mitigation testimony during the penalty phase because it could open the door to other damaging testimony.” Griffin v. State, 866 So.2d 1, 9 (Fla.2003) (concluding there was no deficiency where counsel chose not to present witness who would have testified about defendant’s penchant for stealing automobiles and his prior difficulties with murder victim). As this Court stated in Reed v. State, 875 So.2d 415, 437 (Fla.2004), “[a]n ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword.”
In this case, trial counsel reasonably feared that testimony from a mental health expert would be more harmful than helpful. Particularly, trial counsel reasonably feared that raising the topic of sexual abuse or the psychological impact of that abuse could have opened the door to admission as rebuttal evidence of Winkles’ taped statements discussing the abuse. Accordingly, Winkles has not demonstrated deficiency.
Even if this Court were to find that trial counsel was deficient, which we do not, Winkles has not demonstrated prejudice. The testimony presented by Winkles’ experts — Dr. Henry L. Dee and Dr. Michael Scott Maher— during the evidentiary hearing does not undermine confidence in Winkles’ sentences.
Dr. Dee, a neuropsychologist, testified that Winkles’ mother died when Winkles was around three months old and that he was raised by his paternal grandmother and aunts. Dr. Dee explained that Winkles claimed to have begun having consensual sexual activity with his grandmother and aunts as early as age nine and that some of those relationships did not end until Winkles was thirty-two or thirty-three. Dr. Dee stated that Winkles’ grandmother did not discipline Winkles, which was typical in a situation where a child was being sexually abused, and that Winkles stated that his grandmother once cut his hand with a knife while warning him not to disclose the sexual abuse. Dr. Dee opined that Winkles’ account of sexual abuse generally “rings true.” In addition, Dr. Dee testified about Winkles’ lack of respect for women. He explained that Winkles stated that he thinks of all women as “promiscuous in one fashion or another” and as having rape fantasies.
Dr. Dee testified that Winkles’ history of sexual abuse helped explain “how this perversion developed” and would therefore be relevant to the murders. However, Dr. Dee added that when talking about the *27 sexual abuse, Winkles “gave you the feeling that he accepted [the abuse] and didn’t make much of it.” Overall, Dr. Dee opined that there was no statutory mitigation in this case but the “extensive sexual abuse and exploitation” Winkles experienced as a child could have been presented during the penalty phase as nonstatutory mitigation.
Dr. Maher, a psychiatrist, testified that Winkles described his childhood as living in poverty and lacking any discipline. Dr. Maher also testified that, according to Winkles, when he was about seven or nine, Winkles’ grandmother instructed him in performing oral sex on her and that she continued to sexually abuse him throughout his childhood and adolescence. Dr. Maher stated that Winkles claimed his grandmother teased him about the size of his penis and told Dr. Maher that he was raised “in a way that introduced him to the idea that sexual exploitation was acceptable and even to some extent expected and desirable.” Dr. Maher testified that Winkles admitted to attacking many women between 1967 and 1981 and claimed that his grandmother acted as an accomplice in the murders.
Like Dr. Dee, Dr. Maher opined that no statutory mitigation was present in this case but that Winkles’ background, history of sexual abuse, and pattern of sexual perversion potentially could be considered nonstatutory mitigation. Dr. Maher explained that incestuous abuse “tends to be a breeding ground for sadomasochistic personality traits” and that a “pattern of sexual exploitation and abuse interferes tremendously with all kinds of relationships.” He characterized Winkles as having a sexual perversion disorder primarily caused by Winkles’ upbringing. Dr. Maher testified that Winkles had a “pattern of sexualized sadism; that is, experiencing urges and desires that he sought in a sexually gratifying way that were related to humiliating, demeaning, and hurting a woman in the context of a sexual interaction.” Dr. Maher opined that Winkles committed the murders “[b]ecause he has this terrible pattern of urges and desires and he ... does not have the moral conscience to inhibit them sufficiently.” Despite suggesting that Winkles’ sexual perversion disorder could be considered nonstatutory mitigation, Dr. Maher clarified that he believed Winkles did have the capacity to control his behavior at the time of the murders.
Testimony like that given by Dr. Dee and Dr. Maher, if presented at the penalty phase, could have supported a finding of the proposed mitigating factors that Winkles’ mother died when he was very young and that he suffered sexual abuse. In light of such testimony, the sentencing court also could have considered whether a diagnosis of sexual perversion disorder was mitigating. However, as a whole, the testimony offered by Dr. Dee and Dr. Maher does not rise to the level of unpre-sented mitigation previously held to be prejudicial. Cf. State v. Larzelere, 979 So.2d 195, 206 (Fla.2008) (holding that defendant was prejudiced where, after inadequate investigation, trial counsel failed to present evidence of sexual and physical abuse and expert opinion that statutory mental health mitigating factors were applicable as a result of defendant’s personality disorders, post-traumatic stress disorder, and obsessive compulsive disorder); Hildwin v. Dugger, 654 So.2d 107, 109-10 (Fla.1995) (holding that defendant was prejudiced where trial counsel failed to present evidence of defendant’s psychiatric hospitalizations and suicide attempts); Phillips v. State, 608 So.2d 778, 782-83 (Fla.1992) (holding that defendant was prejudiced where trial counsel admitted doing “virtually no preparation” for penalty phase and failed to present evidence of borderline intelligence, schizoid personali *28 ty, head injury, and lifelong deficits in adaptive functioning).
To the contrary, Winkles’ case is more analogous to Willacy v. State, 967 So.2d 131,144 (Fla.2007). In Willacy, trial counsel decided to focus on the positive aspects of the defendant’s life rather than on the defendant’s mental health issues where some of those mental health issues, such as antisocial personality disorder, tended to be looked upon with disfavor by jurors. This Court concluded that because the previously unpresented mitigation evidence would likely have been more harmful than helpful, the defendant was not prejudiced by trial counsel’s decision. Similarly, here the expert witnesses’ testimony that no statutory mitigation was applicable and that Winkles could have controlled his sadistic urges undercuts Winkles’ claim that counsel’s failure to present expert testimony undermines confidence in his sentences. While the expert testimony helps explain some of Winkles’ acts against women, it also highlights the intentional, malicious, and calculated nature of his crimes.
In summary, the sentencing court found a substantial amount of aggravation applicable to the murders in this case: (1) Winkles had a prior conviction of a capital felony or a violent felony (contemporaneous murder convictions and felony convictions predating the murder convictions); (2) the murder was committed in the course of a kidnapping; (3) the murder was committed to avoid or prevent lawful arrest; and (4) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). Given this substantial aggravation and the minimal mitigating value of the proposed mitigating evidence, there is no reasonable probability that the balance of aggravating and mitigating circumstances would have been different had evidence of Winkles’ mental health and history of sexual abuse been presented.
2. J.C. Winkles
Finally, Winkles argues that trial counsel was ineffective for failing to locate Winkles’ uncle J.C. as a penalty-phase witness. The postconviction court denied this claim, finding that Winkles failed to demonstrate that counsel should have known that J.C. was available as a witness or that Winkles was prejudiced. We conclude that because Winkles has not demonstrated prejudice, the postconviction court did not err in denying this claim.
At the evidentiary hearing, J.C. testified about Winkles’ childhood. He explained that Winkles’ mother died shortly after his birth and that J.C.’s mother raised Winkles. J.C. testified that his family was very poor when he was a child. In an affidavit admitted at the evidentiary hearing, J.C. asserted that Winkles lived in the same impoverished conditions in which he was raised.
J.C. explained that although he was no longer living with his mother once Winkles was born, he came to visit once or twice a year. J.C. testified that on at least one occasion during a visit when Winkles was about five years old, J.C. heard family members, including his mother, tease Winkles about his small penis. J.C. did not confirm Winkles’ other claims about sexual abuse by his grandmother and aunts. When asked if he had knowledge of any allegations of child abuse or incest when he was growing up, J.C. stated that he did not. J.C. agreed that he had no knowledge of whether Winkles was sexually abused. He stated that he never saw any signs of violence between his mother, Winkles’ grandmother, and Winkles, and that he had no knowledge of the instance in which his mother allegedly cut Winkles’ hand.
*29 J.C. also described his mother during the evidentiary hearing. He stated that “[b]y most people’s standards, she was an immoral person.” He testified that his mother “had a number of lovers,” served time in federal prison for bootlegging, and considered “[p]etit thievery,” such as stealing coal in the winter, to be acceptable. J.C. stated that his mother never disciplined her children and did not encourage education. J.C. explained:
I think probably [Winkles] was raised under about the same conditions that I was raised, and there — there were positives and negatives. My mama would have done anything for any of her children or grandchildren. She loved us all.
But she was — in retrospect, I can see that she was not a good mother. She did not enforce discipline. We were encouraged to do things that were unlawful, like stealing, and anything that — and sexual morals were not known in our house. There was a lot of promiscuity, and as soon as my sisters were old enough, they got into the same situation, both of them.
He concluded, “I don’t think mama ever changed. She ... lived to be 88, and she was the same person.”
As discussed above, four aggravating factors were found in this case. Given this aggravation, J.C.’s testimony that Winkles grew up in impoverished conditions in a household lacking discipline and role models does not undermine confidence in the sentences.
III. CONCLUSION
For the reasons stated above, we affirm the circuit court’s denial of Winkles’ motion for postconviction relief.
It is so ordered.
QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ., concur.