PER CURIAM.
 

 Leonardo Franqui appeals an order of the circuit court denying his motion to vacate his conviction of first-degree murder and sentence of death filed under Florida Rule of Criminal Procedure 3.850. We have jurisdiction under article V, section 3(b)(1), Florida Constitution. For the reasons expressed below, we affirm the circuit court’s order denying postconviction relief.
 

 I. FACTS AND PROCEDURAL HISTORY
 

 A. Background and the Direct Appeal Proceedings
 

 Leonardo Franqui was convicted of the December 6, 1991, murder of Raul Lopez in Medley, Florida. We affirmed Franqui’s conviction for the first-degree murder of Lopez and the resulting death sentence in
 
 Franqui v. State,
 
 699 So.2d 1312 (Fla.1997). Franqui now appeals the denial of his first motion, as subsequently amended, for postconviction relief filed in 1999 under rule 3.850. An evidentiary hearing was held on two of the claims and relief was summarily denied on the remaining claims.
 

 The relevant circumstances of the crime and trial are set forth in the Court’s opinion on direct appeal as follows:
 

 Leonardo Franqui and codefendants Pablo San Martin and Pablo Abreu were charged with one count of first-degree murder, two counts of attempted first-degree murder with a firearm, one count of attempted robbery with a firearm, two counts of grand theft, and one count of unlawful possession of a firearm while engaged in a criminal offense. Prior to trial, codefendant Abreu negotiated a plea with the State and subsequently testified against Franqui during the penalty phase of the proceedings.
 

 The following facts were established at the trial of Franqui and San Martin. Danilo Cabanas, Sr., and his son, Danilo Cabanas, Jr., operated a check-cashing business in Medley, Florida. On Fridays, Cabanas Sr. would pick up cash
 
 *87
 
 from his bank for the business. After Cabanas Sr. was robbed during a bank trip, Cabanas Jr. and a friend, Raul Lopez, regularly accompanied Cabanas Sr. to the bank. The Cabanases were each armed with a 9mm handgun, and Lopez was armed with a .32 caliber gun.
 

 On Friday, December 6, 1991, the Ca-banases and Lopez drove in separate vehicles to the bank. Cabanas Sr. withdrew about $25,000 in cash and returned to the Chevrolet Blazer driven by his son. Lopez followed in his Ford pickup truck. Shortly thereafter, the Cabanas-es were cut off and “boxed in” at an intersection by two Chevrolet Suburbans. Two occupants of the front Suburban, wearing masks, got out and began shooting at the Cabanases. When Cabanas Sr. returned fire, the assailants returned to their vehicle and fled. Cabanas Jr. saw one person, also masked, exit the rear Suburban.
 

 Following the gunflght, Lopez was found outside his vehicle with a bullet wound in his chest. He died at a hospital shortly thereafter. One bullet hole was found in the passenger door of Lopez’s pickup. The Suburbans, subsequently determined to have been stolen, were found abandoned. Both Suburbans suffered bullet damage — one was riddled with thirteen bullet holes. The Cabanases’ Blazer had ten bullet holes.
 

 Franqui’s confession was admitted at trial. When police initially questioned Franqui, he denied any knowledge of the Lopez shooting. However, when confronted with photographs of the bank and thé Suburbans, he confessed. Fran-qui explained that he had learned from Fernando Fernandez about the Caba-nases’ check cashing business and that for three to five months he and his codefendants had planned to rob the Cabanases. He described the use of the stolen Suburbans, the firearms used, .and other details of the plan. Franqui admitted that he had a .357 or .38 revolver. Codefendant San Martin had a 9mm semiautomatic, which at times jam- • med, and codefendant Abreu had a Tech-9 9mm semiautomatic, which resembles a small machine gun. Franqui stated that San Martin and Abreu drove in front of the Cabanases and Franqui pulled alongside them so they could not escape. Once the gunfight began, Fran-qui claimed that the pickup rammed the Cabanases’ Blazer and Lopez opened fire. Franqui then returned fire in Lopez’s direction.
 

 San Martin refused to sign a formal written statement to police. However, San Martin orally confessed and, in addition to relating his own role in the incident, detailed Franqui’s role in the planning and execution of the crime. San Martin admitted initiating the robbery attempt and shooting at the Blazer but not shooting at Lopez’s pickup. He placed Franqui in proximity to Lopez’s pickup, although he could not tell if Franqui had fired his gun during the incident. Sari Martin initially claimed that the weapons used in the crime were thrown off a Miami Beach bridge, but subsequently stated that he had thrown the weapons into a river near his home, where they were later recovered by the police. San Martin did not testify at trial, but his oral confession was adinit-ted into evidence over Franqui’s objection.
 

 Franqui,
 
 699 So.2d at 1315-16. The jury found Franqui guilty as charged and recommended death by a nine-to-three vote. The trial court followed the jury’s recommendation after finding and weighing four aggravators against two nonstatutory miti-gators. The aggravators found by the trial court were: (1) Franqui was previously convicted, of prior violent felonies; (2) the murder was committed during the course
 
 *88
 
 of an attempted robbery; merged with (3) the murder was committed for pecuniary gain; and (4) the murder was committed in a cold, calculated, and premeditated manner. The court found no statutory miti-gators, but found two nonstatutory mitigating circumstances: (1) Franqui had a poor family background and deprived childhood; and (2) Franqui was a caring husband, father, brother, and provider.
 
 [1]
 

 See Franqui,
 
 699 So.2d at 1316.
 

 Franqui appealed’ his convictions and sentences to this Court.
 
 [2]
 
 In the direct appeal, we held that although the trial court erred in admitting codefendant San Martin’s written confession during the penalty phase of the trial, the error was harmless in light of Franqui’s own confession and other extensive evidence of guilt.
 
 Id.
 
 at 1328. We reversed the two attempted murder convictions on the authority of
 
 Valentine v. State,
 
 688 So.2d 313 (Fla.1996) (citing
 
 State v. Gray,
 
 654 So.2d 552 (Fla.1995) (holding that the crime of attempted felony murder no longer existed in Florida)).
 
 Franqui,
 
 699 So.2d at 1323.
 
 [3]
 
 We affirmed the remaining convictions and sentences.
 

 
 *89
 
 B. Postconviction Proceedings
 

 On January 15, 1999, Franqui filed his initial rule 3.850 motion, which he amended on April 18, 2000, raising a total of ten claims.
 
 [4]
 
 After holding a
 
 Huff
 
 hearing
 
 [5]
 
 on January 8, 2001, the court issued an order on January 7, 2002, summarily denying all of Franqui’s claims except the claim pertaining to Abreu’s penalty phase testimony, which was presented by the State to support the CCP aggravator. The Court allowed Franqui to participate in an evi-dentiary hearing in codefendant San Martin’s case with respect to two claims raised by San Martin concerning the alleged recantation of codefendant Abreu’s penalty phase testimony. Prior to the hearing, and after the Supreme Court issued its decisions in
 
 Ring v. Arizona,
 

 [6]
 

 and
 
 Atkins v. Virginia,
 

 [7]
 

 Franqui filed a supplement to
 
 *90
 
 his motion on October 18, 2002, raising a
 
 Ring
 
 claim and an
 
 Atkins
 
 claim.
 

 At the evidentiary hearing held on December 18, 2002, Pablo Abreu testified concerning the planning of the crime and the timing of the decision to kill Lopez. After the hearing, Franqui filed an additional supplement to his postconviction motion pertaining to his
 
 Ring, Atkins,
 
 and Abreu claims. On March 31, 2005, the circuit court denied the claims relating to Abreu’s testimony and also denied the
 
 Ring
 
 claim. Franqui filed the present appeal, raising five claims. Because the circuit court did not rule on the mental retardation claim, we temporarily relinquished jurisdiction to the postconviction court so it could rule on the
 
 Atkins
 
 claim. The mental retardation claim was summarily denied on February 21, 2008.
 

 On return to this Court from the relinquishment, oral argument was held on March 12, 2009, and we again temporarily relinquished jurisdiction to the circuit court with directions to hold an evidentiary hearing on Franqui’s mental retardation claim.
 
 See Franqui v. State,
 
 14 So.3d 238 (Fla.2009). At the evidentiary hearing held on September 17, 2009, the parties stipulated to introduction into evidence of two expert psychological reports. On October 6, 2009, the circuit court entered its order denying Franqui’s mental retardation claim. The case has now returned from the relinquishment period for review and resolution of all pending issues by this Court. As we explain below, the postcon-viction claims presented in this appeal are without merit. Thus, we affirm the trial court’s denial of postconviction relief.
 

 C. This Appeal
 

 In this appeal, Franqui has presented the following claims: (1) this Court’s interpretation of mental retardation, as set forth in
 
 Cherry v. State,
 
 959 So.2d 702 (Fla.2007), and
 
 Nixon v. State,
 
 2 So.3d 137 (Fla.2009), mandating a cut-off IQ score of 70 or below to meet the first prong of the test for mental retardation in capital sentencing, is contrary to
 
 Atkins v. Virginia
 
 and the Eighth Amendment to the United States Constitution; (2) the circuit court erred in summarily denying various claims of ineffective assistance of counsel for failure to object to the prosecutor’s improper, inflammatory, and unduly prejudicial comments and arguments at the guilt and penalty phases; (3) the court erred in summarily denying Franqui’s claim of ineffective assistance of counsel regarding the failure to present available expert testimony at the penalty phase; (4) the court erred in summarily denying Franqui’s claim of ineffective assistance of counsel for failure to present the testimony of Franqui’s wife at the suppression hearing and at the guilt and penalty phases; and (5) the court erred in denying Franqui’s claim that he was entitled to a new penalty phase due to recanted testimony of Pablo Abreu. We will discuss each issue in turn.
 

 II. ANALYSIS
 

 A. Mental Retardation
 

 After we relinquished jurisdiction for an evidentiary hearing on Franqui’s mental retardation claim, the State and Franqui stipulated into evidence the expert reports prepared by Dr. Trudy Block-Garfield and Dr. Enrique Suarez. Dr. Block-Garfield, a licensed clinical psychologist specializing in forensic psychology, evaluated Franqui in 2003. She administered the Stanford-Binet Intelligence Scale Test-Fourth Edition to Franqui, which indicated that he had a full scale IQ of 76. This score does not indicate mental retardation, but places Franqui in the borderline range of intelligence. She also administered the Wechsler Adult Intelligence
 
 *91
 
 Scale-Third Edition (WAIS-III), which produced a full scale IQ score of 75. In addition, 'she was aware of a 1993 intelligence test administered by Dr. Jethro Toomer — the Wechsler Adult Intelligence Scale-Revised — which indicated Franqui’s full scale IQ was 83. Dr. Block-Garfield opined that Franqui’s true IQ falls somewhere between 71 and 80 and that he is not mentally retarded.
 

 On September 15, 2009, Dr. Suarez, a clinical and forensic psychologist and neu-ropsychologist, issued a report concerning his mental evaluation of Franqui. The report resulted from two evaluation sessions held on August 31, 2009, and September 4, 2009. Franqui was given a number of tests by Dr. Suarez, including the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) and the Test of Nonverbal Intelligence-Third Edition (TONI-3). These tests were administered for the purpose of evaluating Franqui for mental retardation. Dr. Suarez found that under the WAIS-IV, Franqui’s full scale IQ is 75. Franqui was also given the Minnesota Multiphasic Personality Inventory-Second Edition (MMPI-2).
 

 Dr. Suarez administered five symptom validity tests to determine if Franqui was motivated to give his best effort when taking the IQ tests. These tests included the: (1) Structured Inventory of Malingered Symptomatology; (2) Memory Fifteen Item Test; (3) Test of Memory Malingering; (4) Dot Counting Test; and (5) Validity Indicator Profile. Dr. Suarez concluded that Franqui’s scores suggest he may have been malingering with the intent to perform poorly on all the tests administered. Because of this, Dr. Suarez opined that the scores on the IQ tests probably underestimate Franqui’s actual abilities. Based on these findings, Dr. Suarez’s report concluded that Franqui is not mentally retarded. On October 6, 2009, the post-conviction court entered its order denying Franqui’s supplemental claim of mental retardation. After considering the stipulated evidence consisting of the experts’ reports submitted by Drs. Suarez and Block-Garfield, the court found that under Florida law, Franqui does not meet the test for mental retardation.
 

 In order to establish mental retardation under current Florida law and precedent, the defendant must satisfy a three-prong test for mental retardation.
 
 See
 
 § 921.137(1), Fla. Stat. (2009); Fla. R.Crim. P. 3.203;
 
 Nixon v. State,
 
 2 So.3d 137, 141 (Fla.2009);
 
 Cherry v. State,
 
 959 So.2d 702, 711 (Fla.2007). We have “consistently interpreted section 921.137(1) as providing that a defendant may establish mental retardation by demonstrating all three of the following factors: (1) significantly subaverage general intellectual functioning; (2) concurrent deficits in adaptive behavior; and (3) manifestation of the condition before age eighteen. Thus, the lack of proof on any one of these components of mental retardation would result in the defendant not being found to suffer from mental retardation.”
 
 Nixon, 2
 
 So.3d at 142 (citations omitted). In
 
 Cherry,
 
 we held that the language of section 921.137(1) is clear and unambiguous in mandating a strict cut-off IQ score of two standard deviations from the mean score, which is exactly 70.
 
 Cherry,
 
 959 So.2d at 713. The law is also established that where a defendant does not meet the first prong, the court will not consider the other two prongs.
 
 Id.
 
 at 714.
 

 We review the circuit court’s determination that a defendant is not mentally retarded for competent, substantial evidence, and we “do not ‘reweigh the evidence or second guess the circuit court’s findings as to the credibility of the witnesses.’”
 
 Nixon,
 
 2 So.3d at 141 (quoting
 
 Brown v. State,
 
 959 So.2d 146, 149 (Fla.
 
 *92
 
 2007)). The circuit court has discretion to accept or reject expert testimony.
 
 Jones v. State,
 
 966 So.2d 319, 327 (Fla.2007) (citing
 
 Evans v. State,
 
 800 So.2d 182, 188 (Fla.2001)). “Trial judges have broad discretion in considering unrebutted expert testimony; however, the rejection of the expert testimony must have a rational basis, such as conflict with other evidence, credibility or impeachment of the witness, or other reasons.”
 
 Williams v. State,
 
 37 So.3d 187, 204 (Fla.2010). The circuit court’s task is to apply the law as set forth in section 921.137, Florida Statutes, which provides for mental retardation proceedings in capital cases; and the circuit court must also follow this Court’s precedent.
 
 Jones,
 
 966 So.2d at 327. A defendant who raises mental retardation as a bar to imposition of a death sentence carries the burden to prove mental retardation by clear and convincing evidence.
 
 See
 
 § 921.137(4), Fla. Stat. (2009);
 
 Nixon,
 
 2 So.3d at 145. Finally, the Court will review the circuit court’s legal conclusions de novo.
 
 Nixon,
 
 2 So.3d at 141. Based on these authorities and the record in this case, we conclude that the circuit court had before it competent, substantial evidence to find that Franqui is not mentally retarded.
 

 Recognizing that Franqui’s scores prohibit him from meeting the current requirements of the test for mental retardation as a bar to execution, Franqui’s counsel argued below and now argues on appeal that by imposing a strict cut-off IQ score of 70 for a finding of mental retardation, this Court has violated the Eighth Amendment and failed to follow the United States Supreme Court’s decision in
 
 Atkins v. Virginia,
 
 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). He asks the Court to revisit
 
 Cherry
 
 and
 
 Nixon
 
 to determine if we have misapplied the holding in
 
 Atkins
 
 by setting a bright-line, full scale IQ of 70 or below as the cut-off score in order to meet the first prong of the three-prong test for mental retardation. He contends that
 
 Atkins
 
 approved a wider range of IQ test results that can meet the test for mental retardation. Therefore, the issue presented is solely a question of law subject to de novo review. As explained below, a reading of
 
 Atkins
 
 reveals that the Supreme Court did not mandate a specific IQ score or range for a finding of mental retardation in the capital sentencing process.
 

 Atkins v. Virginia
 

 In
 
 Atkins v. Virginia,
 
 the United States Supreme Court overruled
 
 Penry v. Lynaugh,
 
 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989),
 
 [8]
 
 and declared that the mentally retarded must be excluded from execution.
 
 Atkins,
 
 536 U.S. at 318, 122 S.Ct. 2242. In reaching its holding, the Supreme Court discussed the definitions of mental retardation promulgated by the American Association on Mental Retardation (AAMR)
 
 [9]
 
 and the American Psychiatric Association (APA). The Supreme Court found the two associations had similar definitions, defining the test for mental retardation as having three prongs: (1) significantly subaverage intellectual functioning; (2) limitations in adaptive functioning; and (3) mental retardation manifested before 18 years of age.
 
 Id.
 
 at 308 n. 3, 122 S.Ct. 2242. These same three prongs
 
 *93
 
 constitute the test for mental retardation under Florida law. The Supreme Court did note that an IQ between 70 and 75 or lower is typically considered the cut-off IQ score for the intellectual function prong of the mental retardation definition.
 
 Id.
 
 n. 5. However, the Supreme Court did not mandate an IQ range of between 70 and 75 for a finding of mental retardation.
 

 The Supreme Court in
 
 Atkins
 
 recognized that “[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus.”
 
 Atkins,
 
 536 U.S. at 317, 122 S.Ct. 2242. In addition, the Supreme Court noted that the statutory definitions for mental retardation that were already in existence were not identical, but generally conformed to the clinical definition provided by the AAMR and APA.
 
 Atkins,
 
 536 U.S. at 317 n. 22, 122 S.Ct. 2242.
 
 [10]
 
 Consequently, the Supreme Court followed its approach in
 
 Ford v. Wainwright, 477
 
 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986),
 
 [11]
 
 and left to the states “the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.”
 
 Atkins,
 
 536 U.S. at 317, 122 S.Ct. 2242 (quoting
 
 Ford,,
 
 477 U.S. at 416-17, 106 S.Ct. 2595).
 

 When
 
 Atkins
 
 was issued, Florida had already enacted its statute prohibiting the execution of the mentally retarded. § 921.137, Fla. Stat. (2001). Section 921.137(1), Florida Statutes (2009), which is almost identical to the 2001 version of the statute, provides in pertinent part as follows:
 

 921.137 Imposition of the death sentence upon a defendant with mental retardation prohibited.—
 

 (1) As used in this section, the term “mental retardation” means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18. The term “significantly subaverage general intellectual functioning,” for the purpose of this section, means performance that is two or more standard deviations from the mean score on a standardized intelligence test specified by the Agency for Persons with Disabilities. The term “adaptive behavior,” for the purpose of this definition, means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community.
 

 Cherry v. State
 

 The proper interpretation of section 921.137(1) was raised in
 
 Cherry v. State,
 
 959 So.2d 702, 711 (Fla.2007), where the question before the Court was whether section 921.137(1) and rule 3.203 mandate a strict cut-off score of 70 or below on an approved standardized test in order to establish significantly subaverage intellectual functioning.
 
 [12]
 

 Cherry,
 
 959 So.2d at 712.
 
 *94
 
 In his appeal, Cherry contended in pertinent part that an IQ measurement is more appropriately expressed as a range of scores rather than a concrete single number because of the standard error of measurement (SEM). However, we held in
 
 Cherry:
 

 One standard deviation on the WAIS-III, the IQ test administered in the instant case, is fifteen points, so two standard deviations away from the. mean of 100 is an IQ score of 70. As pointed out by the circuit court, the statute does not use the word approximate, nor does it reference the SEM. Thus, the language of the statute and the corresponding rule are clear. We defer to the plain meaning of the statutes[.]
 

 Id.
 
 at 712-13. This same holding was reiterated in
 
 Nixon,
 
 which we discuss next.
 

 Nixon v. State
 

 In
 
 Nixon,
 
 the appellant raised several arguments challenging this Court’s decision in
 
 Cherry.
 
 The essence of the arguments in
 
 Nixon,
 
 which are similar to the arguments Franqui makes in this case, is that based on language in
 
 Atkins,
 
 a firm IQ cut-off score of 70 or below is not the proper standard for determining mental retardation.
 
 Nixon,
 
 2 So.3d at 142. Nixon asserted, as does Franqui, that the Supreme Court in
 
 Atkins
 
 noted a consensus in the scientific community that a full scale IQ falling within a range of 70 to 75 meets the first prong of the test for mental retardation; therefore, Nixon contended, states must recognize the higher cut-off IQ score of 75.
 
 Nixon, 2
 
 So.3d at 142. We disagreed, reasoning that
 
 Atkins
 
 recognized a difference of opinion among various sources as to who should be classified as mentally retarded, and consequently left to the states the task of developing appropriate ways to enforce the constitutional restriction on imposition of the death sentence on mentally retarded persons.
 
 Nixon,
 
 2 So.3d at 142.
 

 Nixon further asserted that this Court’s definition of mental retardation violates both the United States and Florida constitutions because
 
 Cherry’s
 
 interpretation of section 921.137 is inconsistent with the constitutional bar on the execution of mentally retarded persons. We found Nixon’s claim without merit based in part on an earlier finding by the Court in
 
 Jones v. State,
 
 966 So.2d 319, 326 (Fla.2007), that Florida’s definition of mental retardation is consistent with the APA’s diagnostic criteria for mental retardation.
 
 Nixon,
 
 2 So.3d at 143.
 

 Based on the broad authority given in
 
 Atkins
 
 to the states to enact their own laws to determine who is mentally retarded, without any requirement that the states adhere to one definition over another, we deny Franqui’s claim that our interpretation of
 
 Atkins
 
 is infirm. Because the circuit court had competent, substantial evidence to find that under current Florida law Franqui is not mentally retarded, the order of the circuit court denying Fran-qui’s mental retardation claim is affirmed.
 

 We turn next to Franqui’s claim that his trial counsel was ineffective during both the guilt phase and the pénalty phase of his trial.
 

 B. Ineffective Assistance of Counsel Claims
 

 Standard of Review
 

 To establish a claim for ineffective assistance of trial counsel, Franqui must meet both of the requirements set forth in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):
 

 First, the' defendant must show that counsel’s performance was deficient. This requires showing that counsel made
 
 *95
 
 errors so serious that counsel was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant, of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
 

 Id.
 
 at 687, 104 S.Ct. 2052. The prejudice prong is met only if “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.”
 
 Id.
 
 at 694, 104 S.Ct. 2052;
 
 see also Porter v. McCollum,
 
 — U.S. -, 130 S.Ct. 447, 455-56, 175 L.Ed.2d 398 (2009) (explaining that the Court does not require proof “‘that counsel’s deficient conduct more likely than not altered the outcome’ of his penalty proceeding, but rather that he establish ‘a probability sufficient to undermine confidence in [that] outcome’”) (quoting
 
 Strickland,
 
 466 U.S. at 693-94, 104 S.Ct. 2052).
 

 In evaluáting counsel’s representation under
 
 Strickland,
 
 there is a strong presumption that counsel’s performance was not ineffective.
 
 See Strickland,
 
 466 U.S. at 689, 104 S.Ct. 2052 (“Judicial scrutiny of counsel’s performance must be highly deferential.”).. The defendant must “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’”
 
 Id.
 
 (quoting
 
 Michel v. Louisiana,
 
 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Moreover, “[a] fan-assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.”
 
 Id.
 
 It is under these guiding principles that we review the postconviction court’s findings as to Franqui’s ineffective assistance- of .counsel claims. Because Franqui’s claims of ineffective assistance of counsel were summarily denied, we also consider the standard of review that applies to denial of postconviction evidentiary hearings.
 

 Summary Denial of Evidentiary Hearing
 

 A postconviction court’s decision whether to grant an evidentiary hearing on a rule 3.850 motion is ultimately based on written materials before the court.
 
 [13]
 
 Thus, its ruling is tantamount to a pure question of law, subject to de novo review.
 
 See Willacy v. State,
 
 967 So.2d 131, 138 (Fla.2007) (citing
 
 State v. Coney,
 
 845 So.2d 120, 137 (Fla.2003)). When reviewing a court’s summary denial of a rule 3.850 motion or claim, the court must accept the movant’s factual allegations as true to the extent they are not refuted by the record.
 
 Occhicone v. State,
 
 768 So.2d 1037, 1041 (Fla.2000). Generally, a defendant is entitled to an evidentiary hearing on a rule 3.850 motion unless (1) the motion, files, and records in the case conclusively show that the. movant is entitled to no relief, or (2) the motion or particular claim is legally insufficient.
 
 See Freeman
 
 
 *96
 

 v. State,
 
 761 So.2d 1055, 1061 (Fla.2000). The defendant bears the burden to establish a prima facie case based on a legally valid claim; mere conclusory allegations are insufficient.
 
 Id.
 
 We now turn to the specific claims of ineffective assistance of trial counsel that Franqui raises in this appeal.
 

 1. Summary Denial of Ineffective Assistance of Counsel Claims Pertaining to Prosecutorial Comment
 

 Franqui alleged in his motion for postconviction relief that his trial counsel was ineffective for failing to object to numerous comments made by the prosecutor in both the guilt phase and the penalty phase of his trial. The trial court summarily denied the claim, stating that “[t]he Defendant’s allegations that the prosecutor made improper comments throughout the guilt and penalty phases of the trial could have or should have been raised on direct appeal. This claim is procedurally barred.” However, “claims of ineffective assistance of counsel are not [generally] cognizable on direct appeal.”
 
 Eaglin v. State,
 
 19 So.3d 935, 945 (Fla.2009) (citing
 
 Bruno v. State,
 
 807 So.2d 55, 63 (Fla.2001)). In
 
 Bruno,
 
 we explained the distinction between claims that are cognizable on direct appeal and claims that are cognizable in postconviction:
 

 Whereas the main question on direct appeal is whether the trial court erred, the main question in a
 
 Strickland
 
 claim is whether trial counsel was ineffective. Both claims may arise from the same underlying facts, but the claims themselves are distinct and — of necessity— have different remedies: A claim of trial court error generally can be raised on direct appeal but not in a rule 3.850 motion, and a claim of ineffectiveness generally can be raised in a rule 3.850 motion but not on direct appeal.
 

 Id.
 
 at 63 (footnotes omitted). Although we agree with Franqui that his claims of ineffective assistance of counsel relating to failure to object to prosecutorial comments are not procedurally barred, and were properly raised in his post-conviction motion, we find that his claims are without merit.
 
 [14]
 

 As to the prosecutorial comments cited as improper in both the guilt phase and penalty phase, we first note that the amended motion filed by Franqui failed to establish how these alleged instances of ineffective assistance of counsel prejudiced him—mere conclusory allegations are not sufficient.
 
 See Freeman v. State,
 
 761 So.2d 1055, 1061 (Fla.2000). In addition, the majority of the prosecutorial argument alleged to be improper was fair comment
 
 *97
 
 on the evidence or inferences arising from the evidence, or was proper response to argument of defense counsel, and will not be discussed in detail.
 

 We do find that several of the comments cited by Franqui were improper under the circumstances. However, as we explain below, trial counsel’s failure to object to them does not mandate reversal for a new trial or new penalty phase. During the guilt phase closing argument, the prosecutor stated: “The lessers are a joke in this case ... but they have to be read to you by law.” The State contends that this statement was proper because the prosecutor was simply pointing out that the lesser included offense's were inconsistent with the facts of the case. The statement, however, goes beyond that and may reasonably be understood to be an attempt, through sarcasm, to diminish the jury’s obligation to follow the law. However, because the trial court properly and fully instructed the jury on the lesser included offenses, we find that Franqui has not met the prejudice prong of
 
 Strickland. See Anderson v. State,
 
 18 So.3d 501, 517-18 (Fla.2009) (holding that the prejudice prong of
 
 Strickland
 
 was not met in a claim of ineffective assistance of counsel for failing to object to the prosecutor’s misstatement of law where the trial court properly instructed the jury). There is no reasonable probability that but for counsel’s error in failing to object to this comment, the result of the proceeding would have been different—a reasonable probability being one sufficient to undermine our confidence in the outcome.
 
 See Strickland,
 
 466 U.S. at 694, 104 S.Ct. 2052.
 

 Next, in the penalty phase closing argument, the prosecutor made the following statements: (a) “Yes it is much easier for Mr. Franqui to put a gun to somebody’s head and demand their money, you don’t have to work as hard to get the money, that’s Franqui’s way,” (b) “It’s a little easier to put a gun to somebody’s head and pistol whip them and terrorize them and take their hard earned money,” (c) “Why? Because to kill somebody for money is probably the most basic, the most vile of all motives,” and (d) “There is no more vile motive than to kill somebody for money.” The State contends that these statements were proper argument with respect to why the pecuniary gain and the CCP aggravators were entitled to great weight. The statements, while somewhat inflammatory, are relevant to the pecuniary gain aggravator and do not undermine our confidence in the outcome of the penalty phase, despite counsel’s failure to object.
 
 i
 

 Additionally, in the penalty phase closing argument, the prosecutor made the following statements: (a) “Now you know the shocking unbelievable nature of their criminal records,” and (b) ‘You know now that this' was not an isolated incident, you know now that this was the middle incident of an unbelievable crime spree that terrorized five separate human beings in a little over a month between November 29, 1991 and January 14, 1992.” The State contends that both statements were proper argument with respect to the prior violent felony aggravator. We agree that'Fran-qui’s prior violent felony convictions submitted by the State in aggravation were a legitimate subject of prosecutorial comment in the penalty phase, but the words “shocking” and “terrorized” are unnecessarily inflammatory. Even so, our confidence in the outcome of the penalty phase is not undermined by counsel’s error. We have found similar comments either not improper or harmless under the circumstances.
 
 See, e.g., Salazar v. State,
 
 991 So.2d 364, 377 (Fla.2008) (finding prosecutor’s use of the word “terrorizing” in reference to the burglary aggravating offense
 
 *98
 
 was not improper);
 
 Bonifay v. State,
 
 680 So.2d 413, 418 (Fla.1996) (finding prosecutor’s use of the word “exterminate” in the context of the case improper but harmless);
 
 cf. Brooks v. State,
 
 762 So.2d 879, 905 (Fla.2000) (reversing for a new penalty phase for cumulative error where prosecutor made repeated comments about the violent and vicious nature of the defendant as well as numerous other improper comments). Again, we conclude that the prejudice prong of
 
 Strickland
 
 is not met by these comments and, accordingly, Franqui is not entitled to relief on this claim.
 

 Also in the penalty phase closing argument, the prosecutor made the following statement, which was not objected to by trial counsel: “The lawyers that are arguing here before you this afternoon are the same lawyers in the other phase of the trial who told you that their clients confessed to a crime they didn’t commit.” The State contends that the comment was fair rebuttal to Franqui’s attempt during the penalty phase to use the fact that he had confessed to the crime as a mitigator. The statement, however, is actually an attempt to impugn the integrity and credibility of defense counsel. This is improper.
 
 See Brooks,
 
 762 So.2d at 904-05 (finding prosecutor’s attack on defense counsel’s credibility to be improper). Even if counsel was deficient in failing to object to this comment, our confidence in the outcome of the penalty phase is not undermined when we consider the other extensive evidence of aggravation presented to the jury. Any omission on counsel’s part in this regard cannot reasonably be viewed as so affecting the fairness and reliability of the proceeding that confidence in the outcome is undermined.
 
 See Maxwell v. Wainwright,
 
 490 So.2d 927, 933 (Fla.1986) (citing
 
 Strickland,
 
 466 U.S. at 668, 104 S.Ct. 2052). Thus, based on
 
 Strickland
 
 and
 
 Maxwell,
 
 we find that the record conclusively shows Franqui is not entitled to relief on this claim.
 

 Finally, in the penalty phase, the prosecutor made comments that tended to disparage Franqui’s mitigation. The prosecutor argued, “That’s the world of Dr. Toomer [Franqui’s mental mitigation expert], folks. Through the looking glass at Disney World. Make believe. Use your common sense.” This comment, suggesting that the mental mitigation is make-believe or a fantasy, is improper.
 
 See, e.g., Brooks,
 
 762 So.2d at 904 (holding that prosecutorial denigration of a defendant’s mitigation by suggesting it is “phantom” is improper). We have “long recognized that a prosecutor cannot improperly denigrate mitigation during a closing argument.”
 
 Williamson v. State,
 
 994 So.2d 1000, 1014 (Fla.2008). Even though the prosecutor’s comment in this instance was improper, we conclude that under the prejudice prong of
 
 Strickland,
 
 based on the extensive aggravation present in this case, our confidence in the outcome of the penalty phase is not undermined. Thus, relief is not warranted based on counsel’s failure to object to these comments.
 

 Although all the above statements may be read as calling for objections by defense counsel, any omission on counsel’s part in this regard does not rise to the level of a deficiency that “so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.”
 
 Maxwell,
 
 490 So.2d at 932. The State presented extensive evidence of guilt and of aggravation. When viewed as a whole, the record shows that the above statements — either individually or cumulatively — are not so prejudicial as to affect the outcome of the guilt or penalty phases of the trial under the standard set forth in
 
 Strickland.
 
 Because our confidence in the outcome of both the guilt and penalty phases is not undermined by counsel’s fail
 
 *99
 
 ure to object to any of the prosecutorial comments cited here, we conclude that the trial court did not err in summarily denying this claim.
 

 2. Summary Denial of Ineffective Assistance of Counsel Claim Pertaining to Failure to Present Testimony of Dr. Brad Fisher at the Penalty Phase
 

 Franqui contends that the post-conviction court erred in summarily denying his claim that counsel was ineffective for failing to call Dr. Brad Fisher, a clinical forensic psychologist, to testify in the penalty phase of the trial. Franqui asserts that Dr. Fisher could have testified, as he 'did in his deposition, that Franqui would make a good adjustment to prison life and would not commit any acts of violence while incarcerated because he had not done so during the time he had been incarcerated prior to trial. The State submits that the lower court properly found that significant contradictions existed between Dr. Fisher’s opinion and Dr. Jethro Toomer’s opinion such that not calling Dr. Fisher to testify could be considered to be reasonable trial strategy. The circuit court’s order stated:
 

 Dr. Toomer conducted tests on the Defendant, which allowed him to draw opinions regarding his mental health, which were properly presented by defense counsel to the judge and jury during the penalty phase as mitigating factors. The trial judge and jury heard testimony from several witnesses that the Defendant did not use drugs or alcohol. Doctor Toomer opined that the Defendant was mentally retarded. The trial attorney’s choice to not have Dr. Fisher testify regarding a good adjustment to prison life is reasonable. Dr. Fisher also would have testified that the Defendant was not mentally retarded.
 

 Dr. Toomer, á psychologist and dipló-mate of the American Board of Professional' Psychology, conducted a psychological evaluation of Franqui and testified during the penalty phase. He told the jury about Franqui’s difficulties and deprivations early in life and about his mental deficits. Dr. Toomer concluded that Franqui exhibited a lifelong condition under which he would make poor decisions regarding how to behave because he had a low-IQ, deficits in intellectual functioning, and organic deficits.
 
 [15]
 
 Dr. Toomer also testified that Franqui had problems communicating. Dr. Fisher,, on the other hand, had no difficulty communicating with Franqui, and said he observed nothing in his interaction with Franqui indicating a mental illness or any problems with intellectual functioning. Moreover, Dr. Fisher testified to an opinion about Franqui’s level of intelligence that was contrary to Dr. Toomer’s opinion. Dr. Fisher said, “Yes, I think his judgment, his intelligence is probably average.”
 

 Thus, any benefit that would have accrued from using Dr. Fisher’s testimony in the penalty phase would have been offset by the fact that his testimony was contrary to Dr. Toomer’s on a key element of mitigation in Franqui’s penalty phase case—that Franqui had substantial mental deficits. Thus, the record demonstrates that counsel’s decision not to present Dr. Fisher’s testimony under the circumstances “‘might be considered sound trial strategy.’”
 
 Strickland,
 
 466 U.S. at 689, 104
 
 *100
 
 S.Ct. 2052 (quoting
 
 Michel v. Louisiana,
 
 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). We explained in
 
 Winkles v. State,
 
 21 So.3d 19 (Fla.2009), that “[a]n ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword.”
 
 Id.
 
 at 26 (quoting
 
 Reed v. State,
 
 875 So.2d 415, 437 (Fla.2004)). Moreover, error, if any, on counsel’s part in failing to present the testimony of Dr. Fisher during the penalty phase cannot reasonably be viewed as so affecting the fairness and reliability of the proceeding that confidence in the outcome is undermined.
 
 See Maxwell,
 
 490 So.2d at 932. The postconviction court did not err in summarily denying this claim.
 

 3. Summary Denial of Ineffective Assistance of Counsel Claim Pertaining to Failure to Present Testimony of Vivian Gonzalez
 

 Franqui next contends that the postconviction court erred in summarily denying his claim that trial counsel was ineffective in not calling Franqui’s wife, Vivian Gonzalez, to testify at the hearing on the motion to suppress his confession. He also claims that trial counsel was ineffective for failing to call Gonzalez to testify at the guilt and penalty phases of trial. Franqui contends that her testimony would have been relevant to a claim that Franqui invoked his right to counsel prior to his statement being taken and was relevant to his condition on the day he was questioned. At the hearing on the motion to suppress Franqui’s statement, Detective Albert Nabut was asked if he overheard Franqui and his wife talking in a room where they were left by themselves. Detective Nabut confirmed that he overheard some of the conversation but said he did not hear Franqui ask his wife to contact a lawyer.
 

 The postconviction court summarily denied the claim, stating in its order that “Vivian [Gonzalez] Franqui did testify during the suppression hearing regarding the issues raised in the instant 3.850 petition.” In fact, Gonzalez did not testify at the suppression hearing. However, this erroneous finding is likely based on a statement made by Franqui’s postconviction counsel at the
 
 Huff
 
 hearing held on January 8, 2001, where counsel stated: “Vivian was not used at the first phase, although she — she was used at the motion to suppress.” Because the postconviction judge was misinformed on this point, he cannot be faulted for denying relief on a claim that counsel was ineffective for failing to present her testimony at the suppression hearing.
 
 See Terry v. State,
 
 668 So.2d 954, 962 (Fla.1996) (“[A] party may not invite error and then be heard to complain of that error on appeal.”).
 

 Even if counsel had not erroneously caused or contributed to this error, relief would not be warranted on this claim. The fact that Gonzalez would testify that Franqui asked her to call a lawyer is not an invocation of the right to counsel communicated by Franqui to the custodial officers. The request to his wife would not have provided a basis upon which to suppress his subsequent written confession. Moreover, Franqui testified that he was unaware that the police could overhear his conversation with Gonzalez, which occurred in a closed room. Given these circumstances, any statement Franqui may have made to his wife concerning counsel cannot be deemed an invocation of his right to counsel.
 

 In addition, the record shows that Fran-qui executed a written waiver of rights, including the right to counsel, before giving his verbal statement and sworn written statement. Detective Nabut testified that Franqui began to confess before he met
 
 *101
 
 with Gonzalez. An invocation of the right to counsel does not affect the validity of statements made prior to the invocation.
 
 Maharaj v. State,
 
 778 So.2d 944, 956 (Fla.2000). In any event, Gonzalez’s testimony was not inconsistent with Detective Na-but’s testimony that he was initially unaware that the room was monitored, that he did not overhear the beginning of the conversation between Franqui and his wife, and that he never heard Franqui tell her to contact a lawyer. It was possible for Gonzalez to testify that Franqui asked her to call his lawyer and for Detective Nabut to testify that he did not overhear such a request "without their statements being inconsistent. In this respect, Gonzalez’s testimony could not have been used to effectively impeach Detective Nabut’s credibility at the suppression hearing or at trial.
 

 Franqui also claims that trial counsel was ineffective for failing to present Gonzalez’s testimony at trial. However, neither his amended postconviction motion nor his brief on appeal makes clear what testimony she could have offered that would probably have altered the outcome of either the guilt phase or the penalty phase. Franqui’s allegation that his wife could testify about his condition on the day he was interviewed, without more, is insufficient to require an evidentiary hearing.
 

 Based on the foregoing, any omission on counsel’s part in not calling Vivian Gonzalez to testify at the suppression hearing or at trial cannot reasonably be viewed as so affecting the fairness and reliability of the proceedings that our confidence in the outcome is undermined.
 
 See Maxwell,
 
 490 So.2d at 932. Rather, when viewed as a whole, the record shows that the posteon-viction court did not err in summarily denying this claim. Under the standard of review noted above, the motion and record conclusively show that Franqui is not entitled to relief on this claim.
 

 C.
 
 Brady
 
 and
 
 Giglio
 
 Claims Relating to the Testimony of Pablo Abreu
 

 1. Standards of Review for
 
 Brady
 
 and
 
 Giglio
 
 Claims
 

 Franqui next contends that the State withheld favorable, material evidence in violation of
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and knowingly presented false testimony in violation of
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), concerning witness Pablo Abreu.
 
 Brady
 
 requires the State to disclose material information within its possession or control that is favorable to the defense.
 
 Mordenti v. State,
 
 894 So.2d 161, 168 (Fla.2004).
 
 [16]
 
 To demonstrate a
 
 Brady
 
 violation, the defendant has the burden to show (1) that favorable evidence, either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.
 
 See Strickler v. Greene,
 
 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999);
 
 see also Way v. State,
 
 760 So.2d 903, 910 (Fla.2000). To meet the materiality prong of
 
 Brady,
 
 the defendant must demonstrate “a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.”
 
 Strickler,
 
 527 U.S. at 280, 119 S.Ct. 1936 (quoting
 
 United States v. Bagley,
 
 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). “As with prejudice under
 
 Strickland,
 
 materiali
 
 *102
 
 ty under
 
 Brady
 
 requires a probability sufficient to undermine confidence in the outcome.”
 
 Duest v. State,
 
 12 So.3d 734, 744 (Fla.2009). The materiality inquiry is not satisfied by simply discounting the inculpa-tory evidence in light of the undisclosed evidence and determining if the remaining evidence is sufficient. “Rather, the question is whether ‘the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.’”
 
 Strickler,
 
 527 U.S. at 290, 119 S.Ct. 1936 (quoting
 
 Kyles v. Whitley,
 
 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995));
 
 see also Rivera v. State,
 
 995 So.2d 191, 203 (Fla.2008) (same);
 
 Way,
 
 760 So.2d at 913 (same). “It is the net effect of the evidence that must be assessed.”
 
 Jones v. State,
 
 709 So.2d 512, 521 (Fla.1998). “Although reviewing courts must give deference to the trial court’s findings of historical fact, the ultimate question of whether evidence was material resulting in a due process violation is a mixed question of law and fact subject to independent appellate review.”
 
 Way,
 
 760 So.2d at 913.
 

 In
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court held that the prosecutor is prohibited from knowingly presenting false testimony against the defendant. In order to prove a
 
 Giglio
 
 violation, “a defendant must show that (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material.”
 
 Tompkins v. State
 
 , 994 So.2d 1072, 1091 (Fla.2008) (quoting
 
 Rhodes v. State,
 
 986 So.2d 501, 508-09 (Fla.2008));
 
 accord Hurst v. State,
 
 18 So.3d 975, 991 (Fla.2009). If the first two prongs are established, the false evidence is deemed material if there is any reasonable possibility that it could have affected the jury’s verdict.
 
 Tompkins,
 
 994 So.2d at 1091. The State must then “prove that the false testimony was not material by demonstrating it was harmless beyond a reasonable doubt.”
 
 Id.
 
 (quoting
 
 Rhodes,
 
 986 So.2d at 509). Under the harmless error test, the State must prove ‘“there is no reasonable possibility that the error contributed to the conviction.’”
 
 Guzman v. State,
 
 941 So.2d 1045, 1050 (Fla.2006) (quoting
 
 State v. DiGuilio,
 
 491 So.2d 1129, 1138 (Fla.1986)).
 

 Both
 
 Giglio
 
 and
 
 Brady
 
 claims present mixed questions of law and fact.
 
 See Sochor v. State,
 
 883 So.2d 766, 785 (Fla.2004). Thus, as to findings of fact, we will defer to the lower court’s findings if they are supported by competent, substantial evidence.
 
 See id.
 
 “[T]his Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.”
 
 Hurst,
 
 18 So.3d at 988 (quoting
 
 Lowe v. State,
 
 2 So.3d 21, 30 (Fla.2008)). We review the trial court’s application of the law to the facts de novo.
 
 Hurst,
 
 18 So.3d at 988. It is within this framework that we now analyze Franqui’s
 
 Brady
 
 and
 
 Giglio
 
 claims pertaining to the testimony of Pablo Abreu.
 

 2. Discussion
 

 Franqui was granted an evidentia-ry hearing on his claims that the State withheld favorable evidence concerning co-defendant Pablo Abreu’s penalty phase testimony in violation of
 
 Brady,
 
 and that the State knowingly presented Abreu’s false testimony in violation of
 
 Giglio
 
 during the penalty phase to support the cold, calculated, and premeditated aggravator. We turn first to Franqui’s
 
 Brady
 
 claim.
 

 During the penalty phase of trial, Abreu testified through an interpreter that a couple of days before the shooting, a discussion among Franqui, Abreu, and San Mar
 
 *103
 
 tin occurred in which Franqui explained the plan to rob the Cabanases and the need to steal two cars to facilitate that plan. When asked what Franqui said at that time about Lopez, the Cabanases’ unofficial bodyguard, Abreu testified: “First he was going to crash against him and throw him down the curb side, and then he would shoot at him, but he didn’t do it that way.” When asked if the shooting of Lopez was planned before the incident, Abreu stated, “Yes, when we went around,” referring to the discussion that ensued when the three codefendants went out before the day of the robbery to steal two vehicles. The trial court found in the sentencing order that the murder was cold, calculated, and premeditated in part because the robbery was carefully planned in advance and because, sometime before the robbery took place, the defendants decided that Franqui would have to shoot Lopez.
 

 At the evidentiary hearing, Abreu testified in response to questions by codefen-dent San Martin’s counsel that he reached a plea agreement with the State in which he would avoid a possible death sentence in exchange for testifying against both Franqui and San Martin. Abreu reiterated that he, Franqui, and San Martin made a plan to steal two cars and rob the Caba-nases. The vehicles were stolen the day before the robbery and parked for use the next day. Abreu testified that the day the Suburbans were stolen, there was a discussion of the robbery but not about killing anyone. Abreu testified that sometime before the robbery took place (from thirty minutes up to several hours), while riding around in his van with Franqui and San Martin to scout out possible escape routes, Abreu heard Franqui say that he would “take care of’ the bodyguard (Lopez) by running his car off the road, and that Abreu and San Martin would take the money. Abreu also testified at the eviden-tiary hearing that Franqui said the bodyguard was going to shoot at him and he was going to shoot back. According to Abreu, Franqui added, “I know that he’s going to fire at me because he’s the bodyguard and I’m going to shoot also.” However, when asked if the bodyguard shot at Franqui, Abreu said, “Well, I would imagine, right.”
 
 [17]
 
 The postconviction court denied Franqui’s
 
 Brady
 
 claim as follows:
 

 San Martin claims that a
 
 Brady
 
 violation occurred because exculpatory evidence favorable to San Martin (and the Defendant) was suppressed by the State and the State presented false or misleading evidence to the jury....
 

 Based on the record and the testimony of the witnesses during the evidentia-ry hearing, this Court finds that San Martin (and the Defendant) [have] failed to establish any of the
 
 Brady
 
 elements. As discussed above, Pablo Abreu testified that he was always truthful and that no one told him how to testify. The difference between Mr. Abreu’s testimony during the penalty phase and the evidentiary hearing was slight,, a mere inconsistency. No evidence was presented that the State suppressed or failed to disclose any evidence to San Martin or the Defendant. Because San Martin’s motion and the Defendant’s motion and the evidence failed to establish a
 
 Brady
 
 violation, this claim is de
 
 *104
 
 nied. This claim is also denied for the Defendant for the same reasons.
 

 We agree with the postconviction court that no evidence supports the allegation that the State suppressed or withheld favorable evidence. We also find that even if this testimony could be considered to conflict with Abreu’s trial testimony — in which Abreu said that Franqui planned the day before the attempted robbery to kill Lopez — there is no “reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.”
 
 Strickler,
 
 527 U.S. at 280, 119 S.Ct. 1936 (quoting
 
 Bagley, 4
 
 73 U.S. at 676, 105 S.Ct. 3375). Regardless of whether Franqui’s plan to kill Lopez was made in the days before the shooting or in the hours before the shooting, the evidence is sufficient to establish the CCP aggravator. Even without the CCP aggravator, the trial court had before it competent, substantial evidence of other aggravating circumstances: prior violent felony conviction for aggravated assault and armed robbery, and the merged ag-gravators of murder while engaged in the commission of an attempted robbery and for pecuniary gain, weighed against only two nonstatutory mitigators.
 

 Under the circumstances, even if Abreu had testified at the penalty phase as he did in the evidentiary hearing, there is no reasonable probability that the proceeding would have resulted in a life sentence— that is, our confidence in the outcome is not undermined by Abreu’s evidentiary hearing testimony.
 
 See Duest,
 
 12 So.3d at 744 (reiterating that
 
 Brady
 
 requires a reasonable probability of a different result sufficient to undermine confidence in the outcome). Thus, we affirm the circuit court’s denial of Franqui’s
 
 Brady
 
 claim.
 

 We turn now to Franqui’s
 
 Giglio
 
 claim, in which he contends that the State knowingly presented false, material testimony by Abreu during the penalty phase. Although there were some inconsistencies in Abreu’s testimony about when the discussion of killing Lopez occurred, the post-conviction court found them not to be material and denied Franqui’s
 
 Giglio
 
 claim as follows:
 

 Mr. Abreu testified during the penalty phase that a meeting regarding stealing cars to be used during the robbery took place a couple of days before the shooting. When asked about what the Defendant [
 
 18
 
 ] was going to do about the bodyguard (the victim, Raul Lopez), Mr. Abreu responded, “First he was going to crash against him and throw him down the curb side, and then he would shoot him, but he didn’t do it that way.”
 
 Trial Transcript, pp. 2717-2718.
 
 Later in his testimony, Mr. Abreu was asked about the discussion he had with the Defendant and San Martin about killing the bodyguard that occurred before the cars were stolen. Mr. Abreu indicated that Franqui told him that he was going to run the bodyguard off the road then shoot him.
 
 Trial Transcript, pp. 2727-2728.
 

 During the evidentiary hearing, Mr. Abreu stated that the killing was discussed the day of the robbery while he, the Defendant and San Martin were driving around in his van before the robbery took place. Mr. Abreu testified on direct that this discussion occurred thirty minutes before the robbery. On cross-exam, he testified that this discussion could have taken place several hours before the robbery. Mr. Abreu
 
 *105
 
 testified that his testimony on this subject had always been consistent and truthful.
 
 Trial Transcript, p. 60, 66-68,
 
 102-104.
 

 [[Image here]]
 

 Based on the record and the testimony of the witnesses at the evidentiary hearing, this Court finds that San Martin has failed to establish that the state forced Pablo Abreu to present perjurious testimony to the jury. During the penalty phase, the question asked about what Franqui was going to do with the bodyguard did not actually have a time frame. San Martin’s claim assumes that the discussion regarding stealing the cars which occurred several days before the robbery included the interchange about killing the bodyguard. Mr. Abreu’s testimony during the penalty phase does seem to indicate that the discussion about killing the bodyguard took place before the cars to be used in the crime were stolen. The testimony elicited from Abreu during the evidentiary hearing indicates that the discussion about the killing took place between thirty minutes and several hours before the robbery and the killing of the bodyguard. San Martin, at most, has shown that the difference between Mr. Abreu’s trial testimony and the testimony during the evidentiary hearing was an arguable inconsistency. This Court finds that San Martin and the Defendant did not prove that Mr. Abreu’s testimony was false. Inconsistencies are insufficient to show that testimony is false.
 
 Maharaj v. State,
 
 778 So.2d 944 (Fla.2000).
 

 Marilyn Milian, the trial prosecutor testified during the evidentiary hearing that she only asked witnesses to truthfully relate what they knew. She stated, “Under no circumstances in this case or any other case would I ever tell a defendant who is flipping what to testify to or suggest to him that if he doesn’t say it my way he won’t have a plea agreement or force anybody to testify contrary to what it is truthfully happened.”
 
 Transcript, p. 171.
 
 She further stated, “That is all we did and anything else would not only be unethical but suborning perjury. I never did that in my career and certainly not on this case either.”
 
 Transcript, p. 172.
 
 ... This Court finds that San Martin and the Defendant failed to prove that the State knew any testimony was false or that the State knowingly presented perjurious testimony.
 

 The inconsistency in Pablo Abreu’s testimony regarded the time that the plan to kill the bodyguard was discussed. During the penalty phase, Mr. Abreu testified that the discussion took .place before the cars were stolen and perhaps several days before the robbery. During the evidentiary hearing, Mr. Abreu testified that the discussion took place thirty minutes to several hours before the robbery, after the cars had been stolen. In either event, the time was sufficient to support the CCP aggravating circumstance.... This Court finds that San Martin (and the Defendant) [have] failed to prove that Mr. Abreu’s statement was material.
 

 We agree that competent, substantial evidence supports the court’s finding that the prosecutor did not knowingly present false, material testimony by Abreu. Abreu testified at the evidentiary hearing that he told the truth at trial, and that no one threatened him, forced him, or told him how to testify. The prosecutor testified at the evidentiary hearing that she did not knowingly present any false testimony. The inconsistencies shown between Abreu’s testimony in the penalty phase and his testimony at the evidentiary hearing do not prove that the penalty phase testimony was false.
 
 See Maharaj,
 
 778 So.2d at 956 (“To demonstrate perjury,
 
 *106
 
 Maharaj must also show more than mere inconsistencies.”).
 

 Moreover, the inconsistencies are not material. “In order to find the CCP aggravating factor, the jury must determine that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.”
 
 Franklin v. State,
 
 965 So.2d 79, 98 (Fla.2007). Both versions of Abreu’s testimony meet these requirements. Both versions of Abreu’s testimony show that Franqui had a plan in place substantially in advance of the attempted robbery to shoot Lopez and that he took a weapon with him for that purpose.
 

 The last element of CCP is the lack of any pretense of moral or legal justification. Nothing in Abreu’s evidentiary hearing testimony, had it been presented by the State at trial, would have supported a finding of a pretense of moral or legal justification. Abreu’s testimony at the ev-identiary hearing that Franqui said the bodyguard would be shooting at him so he would shoot back does not suggest a moral or legal justification for the shooting. Abreu’s evidentiary hearing testimony concerning when he heard Franqui’s shot did not conflict with his trial testimony or with the uncontradicted trial testimony of the expert that Lopez did not fire his weapon. Even if the prosecutor should have presented the latter version of Abreu’s testimony at trial, we find that that there is no reasonable possibility that the error contributed to the imposition of the death sentence.
 
 See Guzman,
 
 941 So.2d at 1050 (quoting
 
 DiGuilio,
 
 491 So.2d at 1138). Thus, relief is also denied on Franqui’s
 
 Giglio
 
 claim.
 

 III. CONCLUSION
 

 In accord with the above analysis, we affirm the circuit court’s denial of Fran-qui’s claims for postconviction relief.
 

 It is so ordered.
 

 CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, and LABARGA, JJ., concur.
 

 PERRY, J., did not participate.
 

 [1]
 

 . Franqui was also sentenced to life imprisonment on the two attempted murder charges, fifteen years for the attempted robbery and second grand theft, and five years for the first grand theft and unlawful firearm possession, all sentences to run consecutively.
 

 [2]
 

 . On direct appeal, Franqui raised four issues and six subissues in his initial brief. He subsequently raised two supplemental issues, which the Court also decided in the direct appeal. The issues considered on direct appeal were as follows: (1) the trial court abused its discretion in failing to grant Fran-qui’s motions for severance in light of the introduction, at the joint trial, of his codefen-dant’s post-arrest confession which incriminated Franqui; (2) the trial court erred in failing to exclude portions of Franqui’s robbery confession'for which the State failed to prove the corpus delicti; (3) the trial court abused its discretion by prohibiting voir dire examination of the jury as to specific mitigating circumstances and in denying access to the jury questionnaire; (4) the trial court erred in sentencing the defendant to death, a disproportionate, cruel, and unusual punishment under the Fifth, Sixth, Eighth, and Fourteenth amendments; (4A) the trial court erred in finding the murder was cold, calculated, and premeditated (CCP); (4B) the CCP instruction given to the jury was unconstitutionally vague, ambiguous, and misleading; (4C) the trial court erred in failing to credit the nonstatutory mitigating factors that Fran-qui had marginal, if not retarded, intelligence and that he was brain-damaged, in rejecting impaired capacity and age as statutory mitigating factors, and in refusing to instruct the jury on the latter; (4D) death is a disproportionate and unconstitutional penalty in light of the circumstances of this case; (4E) the trial court erred in prohibiting Franqui from informing the jury of the court's power to impose consecutive sentences and the possibility of lifelong imprisonment as an alternative to death, as well as in failing to so instruct the jury upon its own inquiry; (4F) the death penalty is unconstitutional on its face and as applied to Franqui under the Fifth, Sixth, Eighth, and Fourteenth amendments, as well as the natural law; (supplemental claim 1) the trial court erred in granting the State’s motion in limine and denying Franqui the right to cross-examine about the substance of an exculpatory statement made after the confession that the State introduced in its case-in-chief; and (supplemental claim 2) Franqui's convictions on counts II and III must be reversed due to the likelihood that they were for the nonexistent crime of attempted felony murder.
 

 [3]
 

 .The holding in
 
 State v. Gray
 
 was superseded by enactment of a statute creating the offense of attempted felony murder. We recently explained:
 

 The Legislature in 1996, in response to our decision in
 
 Gray,
 
 enacted section 782.051, which created the offense of “Felony causing bodily injury.”
 
 See
 
 ch. 96-359, §
 
 1,
 
 at 2052, Laws of Fla. In 1998, the Legislature substantially rewrote section 782.051 and retitled it “Attempted felony murder."
 
 See
 
 ch. 98-204, § 12, at 1970, Laws of Fla. Thus, attempted felony murder is specifically provided for by statute.
 

 Coicou v. State,
 
 39 So.3d 237, 240 (Fla.2010).
 

 [4]
 

 .Franqui raised the following claims in bus rule 3.850 motion: (1) this Court must assess the cumulative impact of all the new facts in this case whether they are newly discovered, suppressed by the prosecution, or ignored due to defense counsel’s failings; (2) counsel’s failure to investigate and prepare mitigation and to call experts at the penalty phase to testify as to Franqui’s mental health constituted ineffective assistance and denied Franqui a fair trial under
 
 Ake v. Oklahoma,
 
 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); (3) counsel's failure to move for a change of venue rendered Franqui’s convictions materially unreliable, and the court's failure to provide for such a change violated his constitutional rights; (4) Franqui was deprived of his right to adversarial testing and effective assistance of counsel at the penalty phase, thus rendering his death sentence unreliable and unconstitutional; (5) Franqui's convictions are materially unreliable because counsel failed to present the testimony of Franqui’s wife, Vivian Gonzalez, at the hearing on the motion to suppress his confession to support his claim of invocation of counsel and at trial to testify to his condition during interrogation; (6) Franqui’s convictions and sentences are materially unreliable because of counsel’s failure to investigate and the State’s intentional failure to disclose material concerning Abreu’s testimony in violation of Franqui’s rights under
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and the constitution, later amended to include a claim under
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), that the prosecutor knowingly presented false testimony; (7) Franqui was denied his federal and Florida constitutional rights to effective assistance of counsel in pursuing his postconviction remedies because of the rule prohibiting his lawyers from interviewing jurors to determine if constitutional error was present; (8) Franqui is being denied his rights to due process and equal protection, and cannot prepare an effective postconviction motion, because access to the files and records pertaining to his case in the possession of certain state agencies has been withheld in violation of chapter 119, Florida Statutes; (9) the jury was misled in the penalty phase by comments, questions, and instructions that unconstitutionally and inaccurately diluted the jury’s sense of responsibility in the sentencing process, and trial counsel was ineffective for not properly objecting; and (10) Franqui’s sentence of death is premised on fundamental error because the jury received inadequate guidance under Florida’s capital sentencing statute concerning the aggravating circumstances to be considered, and trial counsel was ineffective in failing to object to these errors.
 

 [5]
 

 .
 
 Huff v. State, 622
 
 So.2d 982, 983 (Fla.1993) (holding that the judge must allow the attorneys the opportunity to be heard on an initial 3.850 motion in a capital case for the purpose of determining whether an evidentiary hearing is required and to hear legal argument relating to the motion).
 

 [6]
 

 .
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (holding that under the Sixth Amendment right to trial by jury, aggravating factors that operate as the functional equivalent of an element of a charged offense must be found by a jury).
 

 [7]
 

 .
 
 Atkins v. Virginia,
 
 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding that execution of the mentally retarded is prohibited under the Eighth Amendment to the United States Constitution). On March 19, 2003, Franqui filed a supplement to his
 
 Atkins
 
 claim.
 

 [8]
 

 .
 
 Penry
 
 held that executing mentally retarded people convicted of capital offenses is not categorically prohibited by the Eighth Amendment. This holding was abrogated in
 
 Atkins,
 
 when the Supreme Court held that executions of the mentally retarded are cruel and unusual punishments prohibited by the Eighth Amendment to the federal constitution.
 

 [9]
 

 . The AAMR has since changed its name to the American Association of Intellectual and Developmental Disabilities. It will continue to be referred to here as AAMR.
 

 [10]
 

 . In footnote 22, the Supreme Court stated that "[t]he statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions set forth in n. 3,
 
 supra." Atkins,
 
 536 U.S. at 317 n. 22, 122 S.Ct. 2242. Footnote 3 notes that the APA and AAMR have similar definitions of mental retardation requiring proof of significantly subaverage intellectual functioning, existing concurrently with limitations in two or more areas of adaptive functioning, all manifesting before age 18.
 
 Id.
 
 at 309 n. 3, 122 S.Ct. 2242.
 

 [11]
 

 .
 
 Ford v. Wainwright
 
 involved insanity as a bar to the death penalty.
 

 [12]
 

 .
 
 Cherry
 
 did not involve a claim that .section 921.137 is unconstitutional in how it defines mental retardation. Instead, the claim sought clarification regarding Florida’s definition of subaverage intellectual functioning.
 

 [13]
 

 . Franqui’s amended rule 3.850 motion is governed by the requirements applicable to rule 3.850 rather than Florida Rule of Criminal Procedure 3.851 because the original motion was filed before October 1, 2001, the effective date of rale 3.851. See
 
 Rodriguez v. State,
 
 39 So.3d 275, 283
 
 n.
 
 4 (Fla.2010).
 

 [14]
 

 . Several of Franqui’s claims of improper prosecutorial argument are, however, procedurally barred. Franqui alleged that his counsel was ineffective for failing to object when the prosecutor told the penalty phase jury that if the aggravators outweigh the miti-gators, the jury had the "lawful legal duty” to recommend the death penalty. This comment is clearly improper because, as we have held, "[a] jury is neither compelled nor required to recommend death where aggravating factors outweigh mitigating factors.”
 
 Anderson v. State,
 
 18 So.3d 501, 517 (Fla.2009) (quoting
 
 Cox
 
 v.
 
 State,
 
 819 So.2d 705, 717 (Fla.2002)). Franqui's counsel did lodge an objection to that comment and the issue could have been raised on direct appeal. Because it was not, the claim is now procedurally barred. Moreover, prejudice cannot be shown where, as here, the jury was properly instructed on this issue.
 
 See Anderson,
 
 18 So.3d at 517-18. Similarly, trial counsel also objected when the prosecutor commented in the penalty phase about mitigation evidence that Franqui was not properly disciplined as a child. The prosecutor argued, "I mean, folks, everything is mitigating. You don't hit me, it's mitigating. You hit me too much, it is mitigating.” Because any claim of error as to this comment could and should have been raised on direct appeal, it is also procedurally barred in this postconviction proceeding.
 

 [15]
 

 . Dr. Toomer administered the Revised Beta examination to determine Franqui’s IQ, which resulted in a score of 60. This testing occurred before Florida adopted the Stanford-Binet and the Wechsler Adult Intelligence Scale tests as the approved tests for determining IQ in the capital context. Dr. Toomer also administered a Wechsler IQ test which, as he testified on cross-examination, disclosed that Franqui had a full scale IQ of 83.
 

 [16]
 

 . "[T]he duty to disclose such evidence is applicable even though there has been no request by the accused.”
 
 Strickler v. Greene,
 
 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (citing
 
 United States v. Agurs,
 
 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)).
 

 [17]
 

 . Abreu testified at trial that immediately upon stopping his own vehicle in front of the Cabanases, he heard Franqui’s shot. Firearms identification expert Robert Kennington testified at trial that Lopez’s weapon had not been fired. Abreu admitted at trial that when he initially told police Lopez fired his gun first, that was not true. Abreu also testified at the penalty phase that on the day of the attempted robbery, Franqui supplied the handguns. The testimony Abreu gave at the evi-dentiary. hearing did not directly conflict with his trial testimony or that of the expert on these points.
 

 [18]
 

 . The order was entered in the instant case and applies to Franqui’s claims even though there are references in the order to claims of the codefendant San Martin. References in the order to "the Defendant” are to Franqui and appear in the original court order.